**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

OPAL I. TRAMEL,　　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　)　　Case No. 3:11-cv-1047
　　　　　　　　　　　　　　　　　　　)　　NIXON/BROWN
　　　　　　　　　　　　　　　　　　　)
MICHAEL J. ASTRUE,　　　　　　　　　)
Commissioner of Social Security　　　　　)
　　　　Defendant.　　　　　　　　　　　)

To:　　The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security

Income (SSI) and Disability Insurance Benefits (DIB), as provided under Title XVI and Title II

of the Social Security Act (the "Act"), as amended.  Currently pending before the Magistrate

Judge is Plaintiff's Motion for Judgment on the Administrative Record and Defendant's

Response.  (Docket Entries 14, 19).  The Magistrate Judge has also reviewed the administrative

record (hereinafter "Tr.").  (Docket Entry 11).  For the reasons set forth below, the Magistrate

Judge **RECOMMENDS** the Plaintiff's Motion be **DENIED** and this action be **DISMISSED**

**with prejudice**.

## I.  INTRODUCTION

Plaintiff first filed for DIB and SSI on October 1, 2009.  (Tr. 131-140).  Her claims were

denied initially on March 23, 2010 and on reconsideration on July 20, 2010.  (Tr. 71-76; 80-85).

At the Plaintiff's request, a hearing was held on May 6, 2011 before Administrative Law Judge (ALJ) Scott C. Shimer. (Tr. 28-66; 103-107). The ALJ rendered a timely decision on May 24, 2011. (Tr. 8-27).

In his decision, the ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.   The claimant has not engaged in substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.71 *et seq.*).

3.   The claimant has the following severe impairments: major depressive disorder, post traumatic stress disorder (PTSD), rule out hypochondriasis, history of MRSA infections, hypertension and chronic obstructive pulmonary disorder (COPD) (20 CFR 404.152(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.152(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After consideration of the entire record, the Administrative Law Judge finds that the claimant has the residual functional capacity to lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; frequently handle and grasp with the dominant right hand; and should avoid exposure to concentrated dusts, fumes and gases and poor ventilation. Additionally, the claimant is able to perform simple, routine repetitive tasks; have occasional contact with co-workers and the public; and can adapt to gradual/infrequent workplace change.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was 50 years old at the alleged onset date, described as closely approaching advanced age. The claimant is currently 56 years old, described as advanced age (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CRF 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability

because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined by the Social Security Act, from March 1, 2006, through the date of this decision 920 CFR 404.1520(g) and 416.920(g)).

On September 7, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. 1-3). On October 26, 2011, Plaintiff filed this action for judicial review.

## II. REVIEW OF THE RECORD

Plaintiff was born on April 30, 1955. She was 50 years old at the time of the onset of her alleged disability on March 1, 2006. (Tr. 131). At that time she was married and living with her husband of 32 years. (Tr. 131, 136). Her husband worked for a construction company and reported earning $1600.00 monthly. *Id.* Plaintiff was widowed in March 2010 and currently lives with her 30 year old son, who she reports is unemployed and an alcoholic. (Tr. 34). She testified that she left school in the 11th grade, but obtained her GED. (Tr. 35). Plaintiff claims she is disabled due to depressive disorder, immune deficiency, MRSA, and thyroid impairments. (Tr. 167). She reports that her mental health impairments began in November 1999 when her brother had brain surgery and she found her daughter-in-law dead from suicide. (Tr. 174). She began taking antidepressants at that time, but did not see a psychiatrist even though she had insurance. (Tr. 40). Plaintiff currently states she receives her medication through the government sponsored "Bridges to Care" program, but is unable to seek psychiatric help because Bridges to Care is not recognized at her local Mental Health Center. (Tr. 41).

Plaintiff's income steadily increased from 1973 through 2003, reaching a peak of $67,825.00 in 2003. (Tr. 148). From 1978 through 2006 she worked as an operations manager for a manufacturing company. (Tr. 168). She reports having held a wide variety of responsibilities such as overseeing the shipping and receiving of a million dollar inventory, driving a forklift and assembling machine parts, producing year end reports, and hiring, firing and supervising employees. (Tr. 35, 168-69). During these years, Plaintiff reports walking for four hours a day, standing for three hours a day, sitting for five hours, climbing for one hour a day, handling big objects for one hour a day, reaching for one hour a day, and writing for seven hours a day. (Tr. 168). She frequently lifted ten pounds and reports having lifted up to seventy pounds. (Tr. 35, 169). Though her salary fell slightly in 2004 and 2005, she continued to earn over $60,000.00 in these years. Plaintiff's income then drastically dropped in 2006, when she earned only $21,193.00. She reports having been downsized from her position on March 15, 2006 because the company was sold and she was allegedly "making too much money." (Tr. 36). She also reports having missed work and performing poorly because of her mental health reasons from 1999 through 2006. (Tr. 37).

Since her dismissal, Plaintiff has not reported any significant earnings. (Tr. 168). She attempted to work in 2009 but earned only $192 after working two days. (Tr. 36, 189). Plaintiff claims she was fired when she could not learn the computer system due to her inability to focus. (Tr. 188, 190). Otherwise, she reports being unemployed and not seeking work due to her alleged disabilities. *Id.* She is currently receiving food stamps. (Tr. 379). Plaintiff filed for bankruptcy on September 11, 2009. (Tr. 144).

Plaintiff reports that her current mental and physical impairments make her afraid to

leave her home. (Tr. 174). She claims she is afraid she will give her MRSA to others, so she only leaves the house about five times per month, if she has to pick up a prescription or go to the store. (Tr. 44, 174). She does report being able to drive herself places. (Tr. 45). She testified that changes in routine make her anxious and even going to the doctor makes her upset and ill. She says she has constant fear, pain, and fatigue. *Id.* In addition to panic attacks, she reports experiencing flashbacks from her traumatic childhood. (Tr. 42). She claims her mental health issues have impacted her ability to perform routine daily activities. She states she only sometimes bathes, and sometimes has to be reminded. (Tr. 179). She says she wears the same clothes for several days, doesn't do much cleaning, and eats simple meals such as a can of soup or sandwiches. (Tr. 45). At times, she does not want to get out of bed. If she does get out of bed she just sits and stares into space or watches TV. (Tr. 44, 46). Plaintiff experiences sleep disruptions and reports only being able to sleep for three hours a night. (Tr. 46). Physically, she reports the pain from her MRSA limits her ability to grip items or lift things over ten pounds. (Tr. 51). She also reports heart problems that make her winded and panting when walking fifty feet, sitting for forty minutes, or standing for ten minutes. (Tr. 48-49).

Plaintiff was treated concurrently by Dr. Katherine W. Jones and Dr. Steven R. Kinney from 1999 to 2010. Dr. Kinney and Dr. Jones prescribed medication including Zoloft, Wellbutrin, Paxil, and Effexor. (Tr. 241-267). Dr. Jones and Dr. Kinney list insomnia, panic attacks, depression, and anxiety as frequent diagnoses, but provide few specifics in their treatment notes of these impairments. (Tr. 221-271). On August 8, 2001, during a routine exam with Dr. Jones, Plaintiff is described as stressed. (Tr. 271). It is listed that she is taking Zoloft, Wellbutrin, and several other medications. *Id.* On January 9, 2002, Dr. Jones reports Plaintiff

has decreased sex drive, feels terrible, and is depressed about her daughter-in-law's suicide. Dr. Jones diagnosed Plaintiff with depression and prescribed Wellbutrin and Celexa. (Tr. 267). On February 1, 2002, Dr. Jones again prescribed Plaintiff Wellbutrin and Celexa. (Tr. 264-65). On July 29, 2002, during a routine physical with Dr. Jones, Plaintiff denied insomnia and irritability, though reported some fatigue and weakness. (Tr. 258). Dr. Jones reported that Plaintiff had "no anxiety, no agitation, [and] no depressed affect." (Tr. 260). On July 28, 2005, Plaintiff is reported to be crying, with anxiety. (Tr. 241). Dr. Kinney prescribed Cymbalta and suggested a psychiatric evaluation. *Id.* On March 27, 2006, Dr. Jones writes that Plaintiff was "downsized from her job and is stressed. Worried about what she will do." (Tr. 324). On May 8, 2007, Dr. Jones reports that Plaintiff is having panic attacks. (Tr. 323). On March 16, 2009, Plaintiff is noted as "depressed." (Tr. 317). On August 25, 2009, Plaintiff is reported to be anxious. (Tr. 315). On September 1, 2009, Dr. Kinney reports that Plaintiff is having anxiety attacks and feels like she is "shaking inside." (Tr. 225). On June 9, 2010 Plaintiff is described as "having suicidal thoughts" but "no plan at this time." (Tr. 410).

Dr. Jones completed a Medical Source Statement on September 22, 2009. (Tr. 402-06). She listed Plaintiff had the following symptoms: poor memory, sleep disturbance, emotional ability, panic attacks, loss of interest, psychomotor agitation, feelings of guilt, social withdrawal, decreased energy, and generalized persistent anxiety. (Tr. 402). Based on her assessment, she opined that Plaintiff would be absent from work more than three times a month. (Tr. 403). She found Plaintiff to have marked impairments in her ability to remember and carry out detailed instructions, maintain attention for two hours segments, deal with stress from semi-skilled or skilled work, work in coordination or proximity to others, complete a normal workday or

workweek without interruption from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 404).  Dr. Jones found Plaintiff's other impairments to be either mild or moderate.  (Tr. 404-05).  On March 31, 2010, Dr. Jones wrote an addendum to her evaluation, detailing Plaintiff's loss of her sister and husband.  (Tr. 372).  Dr. Jones reports that these events have increased Plaintiff's anxiety and depression and that "things are getting steadily worse."  *Id.*  On April 18, 2011, Dr. Jones wrote an additional addendum stating that "there is no way [Plaintiff] could work in the condition she is in."  (Tr. 408).  She stated that Plaintiff is "unable to even get out of the house due to her depression" and thus is "unable to work due to her mental problems from severe depression."  *Id.*

Dr. Kinney frequently treated Plaintiff for mental impairments before the onset of her alleged disability on March 1, 2006.  (Tr. 222-23).  Dr. Kinney diagnosed Plaintiff with panic disorder without agoraphobia on September 1, 1999 and again on July 28, 2005.  (Tr. 221-22).  He diagnosed her with major depressive affective disorder of a moderate degree on September 1, 1999, January 1, 2002, and December 22, 2005.  Dr. Kinney diagnosed Plaintiff with insomnia and anxiety on July 28, 2005. (Tr. 221).  Dr. Kinney also diagnosed her with the following physical impairments:  infection with microorganisms resistant to penicillin, carbuncle and furuncle of the hands on September 1, 1999, hypothyroidism on July 29, 2002, and hypertension on September 8, 2009.  *Id.*  Plaintiff was treated by Dr. Kinney three times after her alleged disability onset date–on May 31, 2007, January 2, 2009, and September 2, 2009.  (Tr. 225, 227, 229).  On May 31, 2007, Plaintiff presented with lightheadedness, nausea and an ear ache.  Dr. Kinney prescribed antibiotics and a nasal spray.  (Tr. 229).  On January 2, 2009, Plaintiff complained of a sore throat, headache, dizziness, and coughing.  Dr. Kinney prescribed

antibiotics.  (Tr. 227).  On September 2, 2009, though Dr. Kinney noted Plaintiff had a history of panic attacks on May 31, 2007, the primary purpose of the visit was for chest pain.  (Tr. 229).

In September 2009, Dr. Kinney completed a Medical Source Statement.  (Tr. 412-416).  In addition to the symptoms Dr. Jones found, Dr. Kinney found Plaintiff to have appetite disturbance with weight change, personality change, mood disturbance, difficulty thinking or concentrating, suicidal ideation or attempts, blunt or inappropriate affect, intrusive recollections of a traumatic experience, persistent irrational fears, hostility and irritability, and pathological dependence or passivity.  (Tr. 412).  He stated Plaintiff had "constant crying," "severe panic attacks," and "severe depression."  (Tr. 413).  Based on his assessment he opined that Plaintiff was "not employable the last nine months!"  *Id.*  Dr. Kinney found Plaintiff to have a "complete loss" of most abilities.  (Tr. 414-15).  The only abilities he found Plaintiff to have retained was an ability to remember locations and work-like procedures, to understand and carry out short, simple instructions, to adhere to basic standards of neatness and cleanness, and to be aware of normal hazards.  *Id.*

On December 22, 2009, Dorothy Lambert, Ph.D. completed a consultative examination of the Plaintiff in conjunction with Plaintiff's disability benefits claim.  (Tr. 332-338).  Dr. Lambert reported Plaintiff to be "a fair historian" but "rather dramatic" who "may have exaggerated her symptoms."  (Tr. 332).  Plaintiff was described as oriented but anxious and depressed.  (Tr. 333).  Plaintiff reported that she currently had suicidal ideation, though no concrete plans for suicide.  *Id.*  She reported having concrete suicidal thoughts in 1999 when she found her daughter-in-law dead from committing suicide.  *Id.*  Dr. Lambert reported Plaintiff's concentration to be moderately impaired, and her intellectual ability to be in the low average range.  (Tr. 333, 336).

Dr. Lambert noted that Plaintiff was not impaired in her ability to understand and remember short work-like procedures and locations. (Tr. 333, 336). She was found to be markedly impaired in her ability to react to changes. (Tr. 336). Dr. Lambert suggested that Plaintiff should not manage her own finances. *Id.* Dr. Lambert diagnosed Plaintiff with severe major depressive disorder with possible mild psychotic features, and post traumatic stress disorder. *Id.* However, Dr. Lambert could not rule out malingering or hypochondriasis and suggested MMPI psychological testing. *Id.* Overall, Dr. Lambert diagnosed Plaintiff with a GAF of 49[1], if she was not exaggerating. (Tr. 337).

On January 15, 2010, Plaintiff sought treatment in the emergency room at the Summit Medical Center having had intermittent chest pains for the past week. (Tr. 339-49). Though chronic interstitial changes and hyperinflation were noted consistent with emphysematous, no acute cardiopulmonary changes were found and patient was discharged. (Tr. 348). During a stress test, Plaintiff reported chest pain on a scale of 6 out of 10 after four minutes of exercise. However, no ischemic ST segment changes were noted. (Tr. 349). Plaintiff was referred to Dr. Kreth for follow-up care, but she reported that she did not have the funds to pay for follow-up testing for heart disease. (Tr. 341, 372).

On March 1, 2010, Theren Womack, Ph.D. completed a Psychiatric Review Technique and Mental Residual Functional Capacity assessment on behalf of the DDS. (Tr. 354-71). Dr.

---

[1] A GAF score is a subjective determination which represents the "clinician's judgment of the individual level of functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 30 (4th ed. 1994). The GAF score ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or other or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death.) *Id.* A GAF of 41-50 connotes "serious symptoms or serious impairment in one of the following: social, occupational, or school functioning." *Id.*

Womack found Plaintiff to have Affective Disorders, Anxiety Related Disorders, and Somatoform Disorders. (Tr. 354). Specific disorders noted were Major depressive disorder and post-traumatic stress disorder. (Tr. 357, 359). Like Dr. Lambert, Dr. Womack suggested that hypochondriasis and malingering should be ruled out. (Tr. 360). He found Plaintiff's complaints only "partially credible" because the "severity and intensity of the alleged symptoms are not completely consistent with the objective findings from the evidence in the file." (Tr. 366). Dr. Womack noted discrepancies between Plaintiff's self-report of activities of daily living (ALDS) and her consultative examination. For example, Plaintiff reported not being able to cook on her ALDS but stated she could cook simple meals during her consultative exam with Dr. Lambert. *Id.* Overall, Dr. Womack reported Plaintiff to have moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 364). He recommended great weight be given to Dr. Lambert's CE except in the area of adaptation given the inconsistencies. (Tr. 366).

In June 2010, Deborah Doineau, Ed.D., a licensed Psychologist, completed a consultative examination of the Plaintiff in conjunction with her disability benefits claim. (Tr. 377-381). Plaintiff reported that both her husband and sister had died in March 2010. (Tr. 377). Dr. Doineau reported that overall Plaintiff had a "very unpleasant manner." *Id.* Despite this, Dr. Doineau found Plaintiff to have no limitation in understanding or remembering and had the mental capability to manage her own funds. (Tr. 380). She found Plaintiff to have moderate social and adaptability limitations, and moderate to marked limitations sustaining concentration or pace. *Id.* Her assessment was based on Plaintiff's difficulty performing serial 3s and 7s and her inability to spell the word "world" backwards. (Tr. 379). Overall, Dr. Doineau reported

Plaintiff could perform most basic tasks such as shopping, driving, and making decisions. (Tr. 381). Plaintiff self-reported doing laundry, household chores, sometimes cooking for herself and her son, reading her mail, keeping her appointments on her calendar, driving to appointments, sometimes attending church, and trying to get at least one task accomplished per day. (Tr. 380).

On July 2, 2010, Rebecca Joslin, Ed.D., Ph.D., completed a Psychiatric Technique and Mental Residual Functional Capacity assessment on behalf of the DDS. (Tr. 384-400). Dr. Joslin reported Plaintiff to have Affective Disorders, Anxiety Related Disorders, Somatoform Disorders, Personality Disorders, and Substance Addiction Disorders. (Tr. 384). She further reported Plaintiff to specifically have Major depressive disorder, bereavement, panic disorder, and a history of alcohol abuse and dependency. (Tr. 387). Dr. Joslin listed that hypochondriasis, malingering, and borderline traits needed to be ruled out. (Tr. 390-91). Overall, Dr. Joslin reported Plaintiff to have moderate limitations in activities of daily life, social functioning, and maintaining concentration, persistence or pace. (Tr. 394). She listed Plaintiff as having specific limitations maintaining attention and concentration for extended periods, working in coordination with or proximity to others without being distracted by them, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and responding appropriately to changes in the work setting. (Tr. 398-99). She opined that Plaintiff should be able to understand and remember simple instructions, and maintain attention, concentration and pace for at least two hours. (Tr. 400). Dr. Joslin recommended, however, that Plaintiff not interact directly with the

general public or be required to adapt to frequent workplace changes.  *Id.*  However, Dr. Joslin found that Plaintiff could occasionally interact with coworkers or supervisors, as long as feedback from supervisors was given to her in a supportive manner.  *Id.*  Dr. Joslin reported Plaintiff to have marked limitation interacting appropriately with the general public.  (Tr. 399). Dr. Joslin recommended giving great weight to the consultative exam from Dr. Doineau.  (Tr. 396).

The Vocational Expert ("VE") testified that Plaintiff's past work as an inventory clerk would be classified as light, semi-skilled work, and her work as an operations manager as light, skilled work.  (Tr. 56-57).  Neither the ALJ nor VE believed that any skills from her previous work would transfer due to her residual functional capacity's limitation to simple, routine, repetitive tasks.  (Tr. 57).  When asked if a significant number of jobs existed in the national economy for someone with the Plaintiff's age, education, and past work experience, who was limited to work of medium exertion, with simple, routine, and repetitive tasks, and only gradual workplace changes, who could only have occasional contact with the public, who could not be exposed to dust, fumes, odors, gases, who could handle and grasp with her right hand, the VE testified that Plaintiff could be employed as a packer, production helper, or store laborer.  (Tr. 58-59).  When the ALJ further limited the work to that with light exertion, the VE stated that Plaintiff could be a table worker, production worker, or an officer helper.  (Tr. 59-60).  When the work was further limited for someone who was unable to sustain attention, concentration, persistence, or pace for more than two hours at a time, the VE testified that would rule out most jobs.  (Tr. 60).  The VE also stated that if Plaintiff had a high absentee rate of three or more days a month, that would preclude all work because Plaintiff would be terminated.  (Tr. 61).  The VE

testified that even two absences a week could result in termination for unskilled jobs. *Id.*

### III.  PLAINTIFF'S STATEMENT OF ERROR AND CONCLUSIONS OF LAW

Plaintiff alleges the ALJ committed one error.  Plaintiff alleges that the ALJ failed to properly weigh the opinions of Plaintiff's treating physicians and therefore improperly evaluated Plaintiff's mental residual capacity.  (Docket Entry 14).

A.    Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a difference conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the record was not considered as a whole, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B.    Proceedings at the Administrative Level

The Claimant has the ultimate burden to establish an entitlement to benefits by proving

his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1.  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2.  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3.  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4.  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

5.  Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

C.  <u>The ALJ Properly Weighed the Opinions of Plaintiff's Treating Physicians and therefore Properly Evaluated Plaintiff's Mental Residual Capacity.</u>

In determining whether the Plaintiff has a disability, the ALJ looks at all material facts. 20

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpart. P, Appendix 1.

C.F.R. § 404.1520(a). The ALJ must give substantial deference to the treating physician's opinion "if that opinion is not contradicted . . [because] the treating physician has had a greater opportunity to examine the patient . . . and is generally more familiar with the patient's condition than are other physicians." *Walker v. Secretary of H.H.S.*, 980 F.2d 1066, 1070 (6th Cir. 1992). A treating physician's opinion will be given controlling weight if it is "well-supported by medically supported clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). When faced with conflicting evidence from the treating physician and consulting physicians, the ALJ must resolve the conflict. *Richardson v. Perales*, 402 U.S. 389, 399 (1971).

The ALJ will look toward the following factors in determining the weight to give to the treating physician's opinion: (1) The length of the treatment relationship and the frequency of the examination, (2) The nature and extent of the relationship, (3) Supportability, (4) Consistency, (5) Specialization, (6) Other factors. 20 C.F.R. § 404.1527(c)(1-6). Based on an assessment of these factors, an ALJ can properly reject the opinion of a treating physician when that opinion is not sufficiently supported by medical findings. *Combs v. Commissioner*, 459 F.3d 640, 652 (6th Cir. 2006) (en banc); *Walters v. Commissioner*, 127 F.3d 525, 530 (6th Cir. 1997). In addition, for mental impairments, the Sixth Circuit has held that the opinion of a physician regarding a claimant's mental impairments is not entitled to substantial weight where the physician has no special training or experience in psychiatry. *Sherrill v. Secretary of H.H.S.*, 757 F.2d 803, 805 (6th Cir. 1985).

Regardless of a physician's opinion, the legal determination of disability always lies with the ALJ. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The ALJ is not bound by a

physician's conclusion that the Plaintiff is unable to work or is disabled. 20 C.F.R. §

404.1527(d)(1). The ALJ is not "bound by conclusory statements of doctors, particularly where

they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246

F.3d 763, 773 (6th Cir. 2001). The ALJ must instead follow the statutory definition of disability.

*Id.* In doing so, the ALJ must always give "good reasons in [their] notice of determination or

decision for the weight we give [the] treating physician." 20 C.F.R. § 404.1527(c)(2).

Using the above standard, the issue before this court is whether there exists substantial

evidence to support the ALJ's finding that the Plaintiff is not disabled. Substantial evidence exists

where there is "more than a scintilla. It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. Analyzing the

Plaintiff's record as a whole, the ALJ properly weighed the evidence of Plaintiff's treating

physicians. (Tr. 15-20). Moreover, the ALJ gave good reasons for his determinations of the

weight given to the opinions of the two treating physicians. *Id.* As such, substantial evidence

exists in the record to support the Commissioner's decision. *Landsaw*, 803 F.2d 211, 213 (6th

Cir. 1986).

Both Dr. Jones and Dr. Kinney treated the Plaintiff consistently for eight to nine years,

from 2001 through the time of the appeal hearing. Each doctor saw the Plaintiff at least fifteen

times during this time span. (Tr. 221-324). However, the majority of these office visits were for

symptoms related to bronchitis, sore throats, sinusitis, rashes, coughs, flu, blood pressure, thyroid,

routine physicals, and other routine medical treatments. *Id.* Plaintiff subjectively reported

psychological symptoms as the reason she was seeking treatment from Dr. Kinney four times–on

July 28, 2005, September 12, 2005, December 22, 2005, and September 1, 2009. Plaintiff also

reported psychological symptoms as the reason she was seeking treatment from Dr. Jones four times–on January 1, 2002, February 1, 2002, July 29, 2002, and August 25, 2009. *Id.* Both Dr. Kinney and Dr. Jones prescribed Plaintiff a variety of anti-anxiety and anti-depression medications. Neither physician, however, reported any psychological counseling to Plaintiff for her psychological impairments or the administration of any psychological or psychiatric assessments. *Id.* In addition, neither Dr. Kinney nor Dr. Jones are specialists in psychology or psychiatry. (Tr. 17).

The ALJ noted inconsistencies in Dr. Kinney's treatment notes concerning both Plaintiff's physical impairments as well as her mental impairments. Based on these inconsistencies, the ALJ gave Dr. Kinney's opinion little weight. In regards to Dr. Kinney's opinion on Plaintiff's physical impairments, the ALJ summarized Dr. Kinney's opinion as follows:

> In September 2009, Dr. Kinney completed physical and mental assessments of the claimant, basically finding the claimant unable to sustain work. Dr. Kinney stated the claimant's impairments were primarily psychological in nature, but then found the claimant able to able to (sic) life and carry only up to five pounds occasionally, and never any more weight than that; stand and walk less than one hour in an eight-hour workday (less than 15 minutes uninterrupted); sit less than one hour in an eight hour workday (less than 15 minutes uninterrupted); with the requirement to alternate between sitting and walking at will; and never able to reach, grasp or handle with either hand. (Tr. 16).

Based on his consideration of the entire record, the ALJ did not give great weight to Dr. Kinney's opinion regarding Plaintiff's physical impairments. The ALJ explained:

> With regard to physical limitations, Dr. Kinney found the claimant unable to perform even sedentary work. Dr. Kinney's opinion conflict's (sic) with his own opinion that the claimant's problems were mainly psychological in nature. This opinion was contradictory to his own lack of clinical findings. (Tr. 19).

The ALJ gave proper weight to Dr. Kinney's opinions concerning the Plaintiff's physical impairments. Dr. Kinney's treatment records show no indication that Plaintiff had any physical

ailments that would create the severe impairments he reported. From 2002 through 2009, Dr. Kinney treated Plaintiff for tonsilitis, respiratory infection, bronchitis, shingles, sinusitis, and asthma. (Tr. 221-24). None of these ailments were noted as chronic or non-resolving. On September 1, 2009 Plaintiff complained of chest pains. (Tr. 225). Dr. Kinney diagnosed Plaintiff as having a panic attack–not a physical medical condition. *Id.* This is consistent with Plaintiff's January 15, 2010 cardiac event. Though a diagnosis was not conclusive due to Plaintiff's failure to follow-up, initial tests indicated that Plaintiff's chest pains were not cardiac since the acute pain occurred without ischemic ST segment changes. (Tr. 349). Since Dr. Kinney's opinion concerning Plaintiff's physical impairment was not supported by his medical findings, the ALJ properly rejected Dr. Kinney's opinion. *Combs*, 459 F.3d at 652. *See* 20 C.F.R. §§ 404.1527(c)(3-4), 416.927(c)(3-4).

Regarding Dr. Kinney's opinion of Plaintiff's mental impairments, the ALJ reported:

Also, in n (sic) September 2009, Dr. Kenney (sic) diagnosed the claimant with panic disorder without agorophobia and major depressive affective disorder, recurrent, moderate. Regardless, during the same month, he asserted the claimant's diagnoses were panic disorder with agoraphobia and severe depression. Dr. Kinney then completed an equally contradictory mental assessment of the claimant, as he stated the claimant's ability to understand, remember and carry out instructions was not affected her (sic) impairments. But then opined the claimant had extreme restriction or complete loss of ability in all of the following functional areas: understanding, remembering and carrying out detailed instructions; maintaining attention/concentration for two hour segments; maintaining regular attendance, sustaining an ordinary routine without special supervision, dealing with the stress of sem-skilled/skilled work, making simple work-related decisions, working in coordination with or proximity to others without undue distractions, completing a normal workday or work week without interruptions from psychologically-based symptoms, maintaining socially appropriate behavior, asking simple questions, using public transportation or setting realistic goals. Regardless, Dr. Kinney also concluded that the claimant could manage benefits in her own best interest. (Tr. 16-17).

The ALJ explained in detail his rationale for giving little weight to Dr. Kinney's opinion regarding Plaintiff's mental impairments. He explained:

Dr. Kinney opined that the claimant had extreme limitations in almost every mental health category. This includes an extreme limitation in making even simple work-related decisions. Despite this, Dr. Kinney found that the claimant was capable of handling her own funds. He also indicated, on the same form, that the claimant's ability to understand, remember, and carry out instructions is not affected by the claimant's impairment. Doctor Kinney is not a mental health professional. His extreme limitations are not consistent with the claimant's daily activities. His opinion is also inconsistent with his own findings. (Tr. 19).

The ALJ also gave proper weight to Dr. Kinney's opinion of Plaintiff's mental impairments. On July 28, 2005, Plaintiff presented to Dr. Kinney's office tearfully, complaining of having severe depression, panic attacks and anxiety beginning January 1, 2005. (Tr. 241). Dr. Kinney reports that Plaintiff "asked for time off . . . for mental health." He agreed but "recommended Plaintiff see a psychiatrist." *Id.* On September 12, 2005, Plaintiff again presented tearfully to Dr. Kinney. (Tr. 236). He again suggested she see the psychologist. Plaintiff complied with neither of these recommendations. She testified that even though she had insurance at the time, "I thought I was just depressed. . . . I guess I was making my own diagnosis and not really following through with what they had told me." (Tr. 40). On December 22, 2005, Dr. Kinney provided Plaintiff with a work release, saying she had "improved enough to return to work." (Tr. 231). Medical records indicate that Plaintiff did not again seek treatment primarily for depression, anxiety, or panic attacks from either Dr. Kinney or Dr. Jones until 2009. (Tr. 225). Dr. Kinney's assessment of Plaintiff having a "complete loss" of most functional areas is thus in conflict with his own medical findings. *See* 20 C.F.R. §§ 404.1527(c)(3-4), 416.927(c)(3-4). Dr. Kinney is also not a psychiatrist or psychologist. The ALJ can take a treating physician's specialization into consideration when weighing the physician's opinion. 20 C.F.R. §§ 404.1527(c)(5), 416.927(d)(5). As such, the ALJ properly gave little weight to Dr. Kinney's opinion concerning Plaintiff's mental impairments. *Combs*, 459 F.3d at 652.

The ALJ gave a nuanced analysis of the weight he gave to Dr. Jones' opinion. He gave

great weight to Dr. Jones' opinion with regard to Plaintiff's specific limitations concerning

concentration and social functioning. He explained:

> Dr. Jones found no more than moderate limitations with regard to claimant's social
> functioning limitations. She found marked limitations regarding understanding,
> remembering, and carrying out detailed instructions, but none to mild limitations with
> regard to understanding, remembering, and carrying out short, simple instructions. These
> findings are consistent with the claimant's residual functional capacity. (Tr. 20).

The ALJ, however, pointed to inconsistencies with Dr. Jones' finding that the Plaintiff

would miss more than 3 days per month of work and the medical record, as well as her finding

that the Plaintiff could not maintain attention and concentration for extended periods of time. The

ALJ explained in detail his reasoning for discounting Dr. Jones' opinion. He explained:

> Dr. Jones' finding that the claimant would have a marked limitation in her ability to
> maintain attention and concentration for extended periods is not consistent with the
> findings of mild to no limitations in claimant's ability to understand, remember, and carry
> out, (sic) short, simple instructions. It is also inconsistent with Dr. Jones' finding that the
> claimant would have mild to no limitation in sustaining an ordinary routine without special
> supervision. The claimant's reported daily activities, as well as her ability to complete
> specific forms concerning her disability application are not consistent with Dr. Jones'
> finding regarding the claimant's anticipated missed work days and with her ability to
> sustain concentration. (Tr. 20).

The ALJ also noted the Plaintiff's alleged onset of disability date coincided with the day

she was fired from her job as operations manager in 2006 for non-disability reasons. *Id.* Notably,

Plaintiff listed mental health issues as the reason for seeking treatment from Dr. Jones three times

in 2002, but then did not list mental health issues as a primary reason for seeking treatment from

Dr. Jones until August 25, 2009. (Tr. 315). Dr. Jones notes general observations that Plaintiff is

"stressed," "depressed," or having panic attacks on an additional five other occasions. (Tr. 271,

317, 323-24, 410). Dr. Jones' treatment notes list anxiety or depression as a diagnosis on many

occasions, but do not contain any specific objective measures or observations of Plaintiff's impaired mental condition. (Tr. 315, 317, 318, 323-24, 375, 410). The ALJ also explained that though "Dr. Jones also wrote a summary letter of the claimant in April 2011, stating there was no way the claimant could work, considering the condition she was in . . . which had worsened over the past year . . . [Dr. Jones] had not seen the claimant since the prior summer." (Tr. 17). Pursuant to 20 C.F.R. § 404.1527(c)(1-2), the ALJ can consider the frequency of examination and the nature and extent of the relationship between the Plaintiff and physician. Dr. Jones' assessment also conflicts with Plaintiff's self reported functional abilities in June 2010. (Tr. 377-381). In her consultative examination with Dr. Doineau, Plaintiff reported doing laundry, sometimes cooking for herself and her son, reading her mail, keeping her appointments, driving to appointments, and trying to get at least one task accomplished per day. (Tr. 380). These activities are consistent with the ALJ's finding that Plaintiff is restricted to "work that involves only simple, routine and repetitive tasks, thus should have mild to no limitation regarding this type of work." (Tr. 20). Given the inconsistencies between Dr. Jones' assessment and her clinical findings, her lack of contact with Plaintiff between June 9, 2010 and her assessment in April 2011, and Plaintiff's own report of her functional abilities, the ALJ properly gave little weight to Dr. Jones' opinion of Plaintiff's likelihood of absenteeism and her ability to maintain concentration and attention for extended periods of time. *Combs*, 459 F.3d at 652.

### IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge **RECOMMENDS** that Plaintiff's Motion be **DENIED** and this action be **DISMISSED with prejudice**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in

which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc).

ENTERED this 8th day of August, 2012.

/S/ Joe B. Brown

JOE B. BROWN
United States Magistrate Judge